at the panel, Lisa Corwin v. Georgina Reed, Emily Et al., Abilene Hammond-Shack. Please proceed, Counsel. May it please the Court. My name is Lisa Corwin, and I represent Morgan Jackson and her parents, Ken and Jody Jackson. I'm here asking the Court for a new trial. Morgan just turned four years old when she was operated on by the defendant in this case. The procedure was known as a bilateral ureteral reimplantation procedure, and it's a surgery that plaintiff asserts never should have taken place, in addition to numerous other allegations of negligence, including the fact that the doctor actually operated and did the surgery bilaterally on both ureters, although the left ureter was completely healthy. Because she replaced that left healthy ureter, she – and that was actually the site where she perforated the bladder, failed to close it up, and Morgan, for the next two and a half days, had massive urinary extravasation, which basically means that urine came out of that hole in her bladder and filled her entire abdominal cavity. Just to give the Court a feel for some of the figures we're talking about, the day of the surgery on June 30th, the doctor – the defendant had put 1,923 cc's of fluid into Morgan, and only 45 cc's had come out. The second day, July 1st, 2,754 cc's had been put into Morgan, only 191 cc's had been reported coming out, and it was two and a half days, not until the following day on July 2nd, which we don't have the figures for, that the doctor that evening actually did a sonogram, which revealed the cause of the problem, which was that her abdominal cavity, basically, the way that it was described by some of the witnesses was like she was pregnant. She couldn't even bend over. She became – she had to have a – go through this in my brief, but we're talking about blood transfusions, oxygen. The doctor ordered a molasses enema, a number of things, near mortality and significant and serious morbidity as a result of this failure to diagnose this urinary leak that she had. And she had to have a subsequent surgery. Then she had to have a third surgery to repair damage done by the second surgery or stents that were put in to be removed. Morgan is now 10 years old. She wets the bed almost every night. She changes her own diaper, and that's where she is today. And I'm asking this court to award a new trial because Morgan did not get a fair trial in this case. In fact, the trial shouldn't have even gone forward because a mistrial should have been declared on the very first day that the court heard evidence. One of the allegations that I said was that the surgery never should have taken place in the first place. And the defendant, well, the plaintiff filed a motion in limine saying that certain medical records involving insurance shouldn't be addressed by counsel or the witnesses because they're related to insurance and the scheduling of tests. The court allowed that motion. The defense, an opening statement, and the defendant herself that same day both violated the court's order and referenced the scheduling order that had been precluded by the court. What's the significance of that? Specifically, basically when you have bilateral reflux, what you do is every summer in Morgan's case she would have a test. And there would be a test to determine what grade that reflux was. And I indicated eventually it had cleared on the left side and it was actually normal at the time of the surgery. But every summer she would have a test. In August she was scheduled, August of 2003, she was scheduled to have her test. Her mom called in in May and said my insurance is changing on July 1st. Can we do the test early? Can the test be moved up? And the defense in the case was that basically the parents were the ones that decided to have the surgery, not the doctor. And the court correctly precluded reference to the moving up of the appointment because the appointment was moved up because of an insurance change, not because the parents wanted to have the surgery done when Morgan was 4 years old. She had just turned 4, actually, by 6 days at the time of the first surgery. And Dr. Reed herself, the defendant, indicated she would not operate on the child until she had reached at least 5 years of age. So the moving of the appointment that was scheduled for testing in August to June wasn't relevant. It involved insurance. The court said you can't bring that up. An opening statement, defense counsel completely ignored the court's order. What exactly was said, though? One of the parents called and they said they wanted to move the, there was an objection, right? In the opening statement, correct. The statement was, now the next thing that happened wasn't in August of 2003, which is when the test was scheduled. It was in May. One of the parents called and they wanted to move the, and I objected. The court sustained my objection and said that that was a violation of the order in limine. Admonished counsel in the presence of the defendant and specifically said, do not talk about calling and moving up the appointment. That's even more prejudicial to plaintiffs. That's what the court said in the presence of defense counsel and the defendant herself. Do not talk about that. Do not reference the moving up of the appointment. Are you certain that she was there when the judge said that? Absolutely. Absolutely. And, of course, even if she wasn't paying attention, which she was, but even if she wasn't, counsel has an obligation to tell their witnesses of the court's orders in limine, and the defendant was well aware of that. And then defense counsel, or then we proceed on, and the last thing the jury hears at the end of the day is a defendant volunteering those responses, not in response to questions I'm asking that are even appropriate, but just volunteering it. Specifically, the question I asked was I was talking about the guidelines on when the surgery should be done because Morgan was too young to have this surgery. And I said, if you would have done what this book suggests, antibiotics are continued until the reflux disappears. And she says, okay, yes. And I said, but that isn't what happened with Morgan, right? She wasn't continuing on the antibiotics. You went ahead and did the surgery. Instead of just saying yes, she throws out there at the parent's request. Again, volunteering that the parents had requested. Now, the parents did not request that the surgery be moved up because of the change of insurance. They suggested the test be moved up, and then if the surgery needed to take place, it would take place before the insurance changed. But she just said at parent's request. How did that specifically violate the order in the motion limiting? On that one, I didn't object, Your Honor. I went once. I tried to clear it up. It was not responsive. It was a tiptoe in, but it wasn't a full-blown. A tiptoe in violating what part of the order? That she said that it was at the parent's request. And the order, what was forbidden in the order? The order forbid any information regarding insurance, regarding that they had insurance at the time of the surgery or that they had called and talked about the insurance coverage or that they had moved up. If you look at the record, I think the court specifically said don't talk about calling to move up the surgery. So when she says, the question is. And that was in relation to insurance. Right. Moved up because of insurance. Correct. Could there be a request having nothing to do with moving it up? The parents are requesting the surgery? There could be, but there wasn't in this case. Wasn't that contested in this case? No. It was not. There was never an issue that the parents wanted the surgery independent of after Dr. Reed told them it needed to be done, and then they said, well, can we schedule it before our insurance changes? But there was never any testimony or evidence that the parents said, I know you said you're not going to operate on our child until she's five, but will you please do it a year early? In other words, that's why I'm saying she's tiptoeing in, because I know that what she's trying to get out there is something she's not supposed to. But I didn't object at that point. It was the next question. I said, what's this business about the parents? Did the parents come to your office and say, we demand you do this bilateral re-implantation, which is exactly the question the court asked? The answer is no. But instead of answering it honestly, then she went full blow and said they called, wanted the office visit moved up so they can consider having the surgery done. Yes, because remember, and then she goes on. So at that point in time, she's using even the specific language that the trial court has already said once in open court, do not talk about. That was after the recess during opening statements, which is pretty unusual. The jury recessed during opening statements, and then the trial judge says, I don't want any reference that they move the appointment up. Correct? Yes, they took a break. And that's when the doctor was there and heard that. Yes. When the judge originally ruled on the motion in Lemonade, didn't he waffle a little bit and say, you know what, it's kind of closed. It depends on how the evidence comes in, if they open the door. Yes. We argued this extensively on multiple days. It was a huge issue in the case, which is why the violations weren't accidental. I mean, basically, the defense was like, we want to present this defense. The judge ruled against us. I'm going to throw it out there in opening statement, and my client's going to throw it out there at the end of the day. Was the doctor there during the motion in Lemonade hearings, or was it just counsel? She wasn't there at the pretrial hearings, I don't believe. It's been a while, but I don't believe she was there. But, again, I don't think there was any dispute. It's counsel's obligation to inform his client of the court rulings. She was a little bit of a runaway client, though, because there's a point in, counsel said during opening statements that the doctor had recommended the surgery. Exactly. And later on, she actually disagreed with her attorney in front of the jury, so that that didn't happen or he was mistaken. Right. And that's why, I guess when I was responding to Justice Carter's question, there was never an issue that it was the parents that wanted to have the surgery. Defense counsel in opening statement said, you know, it was Dr. Reed who decided to do the surgery. And then she wanted to present this defense, and so she says, you know, unresponsive to my question, she throws it out there. Parents only wanted the test. Right. If you look at the note from May 22nd, it says, can the August test be moved up? And that's the note from May 22nd. Now, once, and Jody Jackson's testimony was we never talked to the person that actually took the notes. These are nurses' notes. But Jody said, you know, consistent with what was in that May 22nd note, we didn't know whether there was going to be a surgery. We just wanted the test moved up. If Dr. Reed determined, and, of course, parents don't decide whether to perform a surgery. It needs to have, you know, the doctor decides whether it's appropriate to operate on a child. Doctor, if she recommended this, once she recommended the surgery, Jody said, well, if we're going to do this surgery, can we please do it before July 1st because, you know, our insurance is changing and we're going to have to pay a lot more out of pocket if we do it in August or, you know, versus June. We're talking about 60 days, 45 days difference. And, you know. Surgery or the test? The test. But then the doctor said, in light of the test, I'm going to do the surgery. And then she said, well, if you're going to do the surgery, can we do it before? But, again, there's no allegation that there would have been a difference if the surgery would have been performed in August or June. The allegation is that it shouldn't have been performed at all because she wasn't even 5 years old yet. And that would have been a whole other year. Her birthday is, I think it was June 24th. So she had just turned by 6 days 4 years old. And Dr. Reed herself had said in her own medical records, I will not operate on this child until she's at least 5 years old. So our expert said that surgery never should have taken place. But I understand it's an abuse of discretion standard, but I don't think we want to have defendants out there who basically have decided that that's a valid offense and they're going to throw it out there regardless of what an order in limine says. The correct procedure is to try the case, complying with the court's orders, and then bringing it to this court and saying, hey, we think this order was incorrect. Not just winging it, throwing it out there in an opening statement, and again referencing it, using specific language the court said not to at the end of the day. And so I think a mistrial should have been, in this case, awarded to the plaintiff. I also think… Did the counsel concede that, too, before you recessed for the night? Yes. The doctor's attorney said, you know, maybe a mistrial is in order. Yes. Because we're all wrapped up in this. Yes, he did. And then the next morning the judge actually thought it was defense counsel's request for a mistrial. That's correct. So why didn't doctor's counsel speak up? Any reason for… I don't know. I think, you know, maybe Mr. Chodok can respond to that. But I think maybe they had a change of heart overnight. Maybe the court decided, I mean, this wasn't that lengthy of a trial. We had evidence on Tuesday, Wednesday, Thursday. We closed on a Friday. Openings were Tuesday morning. So declaring a mistrial on, you know, what amounted to a three- to four-day trial, I mean, I don't know why he wouldn't want to do that and start off fresh with a jury that hadn't heard twice, beginning of the day and the end of the day, testimony that he specifically precluded because of his prejudicial nature. And then plaintiff was left with deciding, what do I do? Do I point out to the jury the reason the parents called was because their insurance was changing? Well, then I've injected the issue of insurance into the case, which is prejudicial to my client and improper. Two minutes. I better move on. The second issue I think is even more significant, which is that basically the trial court created an entire new category of expert witnesses in this case, a 213F3 witness that's a party despite the fact that the Illinois Supreme Court rules specifically say Rule 213F3 applies to parties. The trial court, without any authority, without any support, declared that I could not cross-examine the doctor about medical articles that she researched and she reviewed in preparation for testifying in the case. She was disclosed as an expert witness by the defendants. She was disclosed as an opinion witness. She's a 213F3 witness under the rules. Under case law, Supreme Court case law, all case law that I've seen out there, you can always cross-examine an expert about what they've been shown, what they reviewed, even if they're relying on it or not. She said that she had six to eight inches worth of articles. She spent four to five hours reviewing literature. She destroyed half of the articles that she found. I asked for those articles. The defense attorney refused to let me ask her questions about that objective, didn't produce the articles. And then the trial court allowed the defense motion to bar me from asking any questions about that and going into any of the literature that she had reviewed. And she was a 213F3 witness. And that is contrary to Supreme Court and appellate court authority on experts. And I don't know how we got there, but we did. And I said, well, it has to be one or the other. If she's a 213F3, then I have to be able to ask her about the literature and what she reviewed as the basis for her opinions because she offered opinions. Or I filed a motion saying bar her from being an opinion witness, keep her to her facts because she can't be an opinion witness if I can't ask her about anything that she reviewed in preparation for her opinions. And the court denied my motion. So basically it created an entirely new category of witnesses that some exception, which I've never seen reported anywhere, that when you're a party, you're not a regular 213F3 witness. Okay. You can finish your comment. I just, you know, basically the trial court created this category of witnesses and allowed the defendant to use herself both as a sword and a shield. A sword because she was able to offer opinions and that she complied with the standard of care, but then a shield which precluded me from cross-examining her based on her status as a party. And that's not in the law. Any comments? Last for the day, but hopefully not least. May it please the court. I'd like to start with plaintiff's motion to eliminate tenant, which the trial court granted. And I want to start there because I think if you listen to a plaintiff's oral argument and if you read plaintiff's brief, they expand the breadth of what was requested by the plaintiff in the motion to eliminate and what was granted. And let me read the motion so I get it right. Motion to eliminate tenant claims motion sought to bar any information regarding insurance, including that plaintiffs had insurance at the time of Morgan's surgery or that Dr. Reed scheduled Morgan's surgery on June 20, 2003, because plaintiffs were changing insurance coverage. That's the relief that was requested, and that is the relief that the trial judge granted. When the trial judge granted the motion to eliminate, he didn't make any additional rulings saying that you're barred from talking about any of the appointments during that summer before August of 2003. There was no such requested relief. So when you turn to the opening argument made by defense counsel, I am at a loss for how that violates plaintiff's motion to eliminate number 10 as I just read it to the court. And again, here's the statement from defense counsel in opening. Now, the next thing that happened wasn't in August of 2003. It was in May. One of the parents called and said they wanted to move the, and that's all the farther they got. No mention of insurance, no mention of moving surgery, no mention of the parents requesting surgery to be moved because of health insurance. We'll never know what was to be said at the rest of that sentence, but the inclination that I had from reading the record was that it was going to be that the August 2003 appointment was moved to June. Not that some surgery was moved, because remember, at this point, surgery isn't scheduled yet. So there's no surgery to move, no rescheduling based on the insurance. Surgery is not scheduled. All that was scheduled for August of 2003 was the yearly consult. The appointment, because Dr. Reed had been following this patient for four years, the August appointment was to look at the kidneys with the ultrasound, make sure there was no new damage to the kidneys or any damage to the kidneys, and to again discuss with the parents whether surgery might be an option. This was moved. Isn't it at that point, though, when if it wasn't clear before, the judge makes it clear? The judge says, I don't want a reference made to them moving the appointment up. I agree. So then you've got a judge saying something to you. So at that point, and I'm assuming that the defendant is in the courtroom then. The defendant is in the courtroom, that's right. What part of that don't they understand? Well, looking at the specific answer provided to or provided by the defendant, I don't think it did bother them, because there's discussion of the appointment in June being to consider surgery. Again, no mention of moving the surgery. And I don't think, as I read it, there was any mention of moving the appointment. There's an appointment in June to consider the surgery. And I think we have to take into context the line of questions that preceded that. There was six, seven, eight questions by plaintiff's counsel, all directing the defendant to the AUA, American Neurology Association guidelines, and saying, well, by this guideline, your surgery was at an improper time. You should have followed conservative care. There should have been surgery at that time. You should have been continuing to prescribe prophylactic antibiotics. They are leading us in a course where there's no answer but to say, look, we're here in part because this is an elective surgery and in part because the parents asked to, again, reconsider the surgery. Otherwise, my defendant is looking at either perjuring herself and saying that the basis of why surgery occurred when it did was something other than it was because the parents' request to move surgery up is part of the basis for surgery. It was an elective surgery. Dr. Reed, during trial, specifically indicated that the course of continuing the prophylactic antibiotics has its side effects, has its downsides, and it's a discussion yearly with the parents whether they want to continue the prophylactic antibiotics or whether they want to move forward with the surgery. So I think to answer your question, I don't think Dr. Reed's eventual answer after being led down this course was in violation of either the direct ruling by the court or the spirit of the court's ruling, frankly. And, again, it was referenced by Justice Wright earlier. The court, when he initially ruled on the motion of eliminating, said, you know, this is a close call. A slight touch will open that door. Well, the seven or eight questions from the plaintiff's attorney leading up to that were the questions that opened that door. Do you think the door was open in this case because of those questions? I do. I do. In what context? I'm sorry? In what context? She specifically is focusing the jury on the timing of the surgery, and she specifically, in the question that led to the allegedly objectionable answer, says, what is this business about the parents? She specifically asks about the parents. She specifically puts my defendant in the position of having to respond to an inquiry about the parents. So not only do I think the six or seven questions leading up to it, but the question that drew the allegedly objectionable answer specifically required my defendant to respond to the parents, respond to the parents' participation in the decision-making process. Did the parents come into your office and say, Did we demand that you do a bilateral re-implantation on our child? She put it at issue. At that point, the defendant has to make some response about the parents because that's what the question calls for. But she didn't say, Did they come in early or demand to come in early and demand that. She said, Did they demand that you do this re-implantation? I don't see where it's responsive to say they called and wanted the office visit moved up. Well, because the jury already knows from both opening statements and the medical records that have been considered at that time that after 02, the next visit is August of 03. So there has to be something to demonstrate to the jury why we're now in May or June instead of August of 03. I think that was the intent of the defendant's answer. It was nothing more than to say, We're not in August of 03 anymore. That's what you just heard about the medical records. That's what you heard about in defense counsel's opening argument that we go from the 02 appointment to the yearly August of 03 appointment. So it is putting – I think the defendant's response there is just putting it in context. Look, it was moved up and we talked about surgery at that time just to explain why the appointment is not in August of 2003 anymore, as the jury previously heard and as the prior note suggested. I'm a little confused about it. Maybe it's – I don't know. You can tell me if you don't think it's relevant. I don't know. But that they talk about moving this day and moving this surgery, and she talks about in her notes at one point where she says, I wouldn't do this surgery before this child is 5. So where do we get to that before – or 4 days after the child turns 4 that they're doing surgery? As Dr. Reed explained during her testimony, both in her adverse examination and correct examination, it's an elective surgery. This is not an acute injury. This is not an urgent care situation where there has to be a surgery now. It's an elective surgery. Some parents elect for it. Others don't. Right. But when the doctor says, I wouldn't do it before 5, are you telling me that you're going to let a layperson dictate, as the doctor, by the doctor dictates to me, that I'm going to do surgery a whole year before I believe that it would be prudent to do so? And when Dr. Reed was examined about that note that said, I wouldn't do it until 5, I think that's the source where she explained it's an elective surgery. If I didn't feel it was safe or appropriate, I wouldn't have done it. At that point, it was an elective surgery. And I think the point to come back to is that's a question of wait for the jury to consider it. If they don't believe, if they believe that Dr. Reed did say in that note, I wouldn't do it until 5, and she did earlier, well then that's best an issue for the jury to look at and determine whether that was malpractice. But coming back to the issue before us, just the small point of whether there was mention of the surgery being moved because of insurance, that's not, I don't think that's related to the surgery being at 5 years versus 4 years. But the judge made it clear he didn't want any discussion of the appointment being moved. And that's when the doctor kicked open whatever door she was standing in. She kicked that door open. I guess I would respectfully disagree. And you're very entitled to. I would respectfully disagree just because of the questions that I, as I mentioned, we don't get there except for the plaintiff's question. And if you look at the trial judge's response and ruminations in the significant oral argument, he referred to Dr. Reed's reference as innocent. He referred to it as not being willful, as not being planned, and he specifically noted that part of his reasoning for denying the mistrial was it didn't come because of a question from the defense counsel. It wasn't planned. The plaintiff's counsel led us down that road. And the trial judge, again, specifically noted that as he was sitting there listening to the questions, he was thinking, oh, boy, the door just got unlocked. It just got opened. That's what the trial judge, hearing the evidence, thought as it was coming out. So I guess I would say I respectfully disagree, and I think the trial judge would respectfully disagree with that. It seems like trial counsel, defense counsel, though, shared the view that maybe you had gotten all wrapped up in that. I'm hard-pressed to speak for my colleague at trial. To me, as I read that comment in the argument, it seemed to me nothing more than an off-the-cuff maybe judge, if that's what you're saying. I sure would hate to see the appellate decision on that off-the-cuff, out of the jury's presence argument. And I think one other thing that we need to go back to is, okay, let's assume we violated the motion. Let's assume that. I disagree, but let's assume it. What was the prejudice? What was the prejudice? They never heard anything about insurance. They never heard anything about the parents requesting surgery to be moved up because of insurance. All they heard at most was that an appointment was moved up. There's nothing there to suggest prejudice that caused the jury to be unfair towards the plaintiff. And let me read to you how, after all the objections, after the claim for mistrial, how it was all cleared up by plaintiff's counsel. Plaintiff's counsel, on page 20 of volume 4, is asking the defendant, Dr. Reed, about the June 12, 2003, office note. And she's asking her to read the note. And it says, ma'am, I asked you to read the note. The nurse, you're not here to testify about what she asked. What does the note say? Dr. Reed responded. It says, quote, here to discuss x-rays and possible surgery. So after all of that, we get to the point where what came out is what should have come out, that the plaintiffs were there in June to discuss possible surgery. Again, no mention of insurance. No mention of the surgery being moved at the request of the plaintiff. Rather, all it said is that they're here to consider surgery, not that they demanded it, not that they required it, not that they requested it. So I think I would respectfully suggest that we didn't violate the motion in limine by the plain terms of the motion or the court's ruling. And even if it was a violation, I would suggest that there was no prejudice.  Dr. Reed was disclosed as an expert, right? Sure. Absolutely. And so now it appears you're trying to expand the work product rule and the attorney-client privilege in those areas. I mean, here you have the defendant doctor, okay, disclosed as an expert. But you're suggesting that the cross-examination that's allowed by the other side on a party expert is somehow different than what's allowed any other expert that's called. Yes, sir. And here's why. Have you had any case on that? There's no case. This is the first time I've ever heard that. It appears to be a case of first impression because I couldn't find a case on the other side of it, frankly. And here's why. I think going all the way back to Darling, my concern is going all the way back to Darling, they refer to the fact you can call defendants to the stand and start getting information for the plaintiff's case in chief from the defendant. Of course. Absolutely. But here's the other thing I refer to the court, too, is that rule 201C of the Illinois Supreme Court rules protects the identity of a consultant from disclosure. And a doctor, by her very nature, the minute she gets sued, she's both a defendant, but she's also an expert, and she's also there to help develop the defense of her case. And I would suggest to you that that doctor is a consultant up until the time that the court requires us to disclose. And at that point, she sure as heck is an expert witness. She has to disclose the basis of her opinions. And she can be cross-examined about anything that she disclosed as the basis of her opinions. And furthermore, she can be cross-examined by any medical literature that the plaintiff found and can get any expert to say is authoritative. Then she can be cross-examined about that. But the defendant, if you're to rule that the defendant doctor cannot participate in developing her defenses, that is going to have a chilling effect on the defense of medical malpractice cases, attorney malpractice cases. You haven't seen any case proposing what you suggest, have you? I have not. And I don't think it's proposing what I should suggest, Judge. I think it's the rule as we practice. And I have not seen a case on the other side suggesting that the defendant is not allowed to participate in the investigation of the claim. She gets that complaint. Have you seen a case where they barred some testimony questions from the other side, and in fact it was a party and there's a work product and attorney  I have not. I have not. And I think part of the reason for that, Judge, is that because of the effect of Rule 213 and the necessity of disclosing what you're relying on and opinions, that's what you're cross-examined on, not about the research or the work you did with your attorney to develop your defense. When – keep in mind – That last two minutes. Thank you. Keep in mind, when the defendant doctor is served with the lawsuit, she has this complaint and she has the 2622 report from the certifying healthcare professional. And the first instance is to talk to the lawyer about what the strengths and weaknesses are of that 2622 report, determine what weaknesses we might identify that might not have even been identified by the plaintiff's expert, and research those things. And that's the point, is that the defendant gets to participate in her defense, gets to discuss with her counsel what potential strengths and weaknesses are of that case, what needs research, and how to go about doing that research. And keep in mind also that this is not research that was available only to Dr. Reed in her little vault in her office. Whatever research was done by Dr. Reed was available to plaintiff's counsel. They could have done the research, sought an admission from some expert witness or the defendant at trial that was authoritative, and cross-examined Dr. Reed about it. See, what I'm having trouble with – excuse me – what I'm having trouble with is this. The cross-examination is the great sort of truth-seeking thing in the trial. And so what you're proposing is the defendant expert doctor has many more protective shields going on than any other expert that would be called in this medical malpractice case. Under 213, under everything because of your expanded view of the work product – in my opinion, the expanded view of the work product privilege, attorney client privilege, which in Illinois has been limited. I mean, we've been limiting in a series of cases for the Supreme Court work product attorney client. And yet what you're proposing – I mean, like one of the cases you cite is a peer-review case, which is not the medical malpractice case. That's right. And I think that peer-review case is really on point because it shows the importance that medical research and how it can divulge the mental impressions. That was in the Medical Studies Act. That was a peer-review case, Anderson v. Rush-Copley. But a peer-review is there's a whole purpose of peer-review. This is a malpractice case. Right. Aren't they different? You're looking at the need for full and frank discussion, full and frank ability to investigate the case. And so in the peer-review, full and frank discussion of the colleague that they're reviewing, and in the medical malpractice case, full and frank review of your own conduct, similar to the peer-review, and your defenses available to you. So there's no way, in my estimation, that a medical malpractice defendant can defend one of these litigations if she can't participate in the investigation and the defense workup. And remember that the attorney is a layperson, not a medical person, and they have to go to their client to discuss these cases. So you've got to – Well, I have a question, though. I want to follow up real quickly. Wouldn't she have been able to participate fully had she chosen the option I'm not going to render an opinion about the standard of care in this case. She just limited it to the facts. She could have read and done anything she wanted to. But when she goes in and says, this is not the standard of care for this procedure, for this age group, then she's put herself in another box. If she wanted to keep in the box where she could keep things private, she needed to have somebody else testify about that. Don't you think? I would respectfully disagree with that because the minute we put a defendant doctor on the stand who's not willing to defend her own care is the minute we lose that case. If Dr. Reid gets on the stand before the jury and says, I can't defend my own standard of care, the case is lost. That would be the first thing we hear from a plaintiff's attorney. So then don't you need to be able to back up where you got that from? You can't just say, no, I used that. I can't tell you where that came from. But that's not the case because she is able to – anything upon which she bases an opinion is disclosed in the Rule 213 disclosure. So it's not – there's no opinion that she's offering at trial that is unsubstantiated or without the basis being disclosed. Anything that she relies on as a basis of her opinions at trial has to be disclosed pursuant to Rule 213. So that's where you have the dual relationship of her being sort of a quasi consultant at the beginning of the litigation. But when it comes to testify at trial, if she's going to testify as an expert, she has to disclose the basis of her opinions just like any other controlled expert. And so I don't see that she has any more significant benefit at trial than any other defendant would. She has to disclose just like Rule 213. Well, isn't there a big difference in the cross-examination from the other side? I mean, under your view, the other side doesn't get to do the same cross-examination that they would do with every other expert. They're limited. I would disagree again because just for Dr. Cooper, our expert in this case, we disclosed his opinions, we disclosed his education, expertise, and all of the medical literature, if anything, he relied on. We did the same thing for Dr. Reed. So the questions that plaintiff's attorney could ask are the same for Dr. Cooper as they were for Dr. Reed. In the 213 disclosures, do you disclose all the research done by the doctor, what they reviewed, all the things they reviewed? Absolutely not. For other 213 experts, do you disclose what they reviewed? I don't think so. I don't think the rule calls for that. The rule calls for disclosure of the basis of the opinions. They can review a lot of things about potential other surgeries, potential other treatment, et cetera, and if they find them not to be relevant to the case, they do just as Dr. Reed did here and throw them out. The Rule 213 requires only disclosure of the basis of the opinion, and that is what was disclosed here. Those articles which Dr. Reed did not rely on weren't disclosed because they weren't a basis of our opinion. We go back to that, what's the basis of your opinion? Thank you for your time. Pano v. Davidson, Leonardo v. Loyola. I think the Darling case, which the court referenced, goes all the way back to 1965. You can cross-examine an expert about anything they have reviewed, regardless of whether they are relying upon it. Anything they have reviewed. Dr. Reed showed up at her deposition. I served a notice saying I wanted to see everything that she had reviewed. She showed up with a stack of articles this tall. They were there at the dep. I asked, did you review those? Yes, I did. How long did you spend reviewing the medical literature? She said, four to five hours. I had six to eight inches of articles. I said, how many do you have there? She said, I cupped. I threw out, spoliation, which I also was precluded from bringing out, which is contrary to Illinois law. I threw out 10 to 15 of them. But I have 10 to 15 of them here with me. And I said, I want to see those, and I want to see what you have reviewed. You're a 213F3 witness. What have you reviewed in this case? I can ask Dr. Cooper that. They can ask my expert, Dr. Gibbons, that. I should have been able to ask Dr. Reed that. She's a 213F3. Counsel objected. She refused to tell me what articles she had reviewed. It doesn't matter whether she's relying upon them or not. I could have cross-examined her. If I could have gotten those articles from her, I could have used those articles in my cross-examination of her at trial. So she basically had the benefit that no other 213F3 witness had in the trial. She could review whatever she wanted. She saw articles possibly that supported her opinion, possibly that didn't. But I never got to even find out what the lady reviewed. I never even got to see those articles. So she created, basically, a special category, or the judge did, by allowing their motion for this witness. Counsel says, well, she can't participate in the defense. She can participate actively in the defense of her case. But what she reviewed in offering her opinion that she complied with the standard of care is not protected. It's not work product of an attorney. These are medical articles that she said in her computer, Medline articles that she reviewed and printed up. That's not a work product of an attorney. That's her researching. And I said, why were you doing that? She said, I wanted to see what was out there in the medical literature about this surgery. She didn't say, I sat with defense counsel and was schooling him on what reimplantation is, and I was doing it to educate my counsel. She didn't say that she was doing it to prepare her defense with counsel and conjunction with him or anything else. It was to offer her opinions, to find out what was in the literature so that she could be a witness in her case. And it's simply unheard of that she gets these special protections. It's nowhere in the law. And basically, the trial court on its own created, at the request of defendants, this special category. And was there some theory that you had followed up on her failure to produce this information and discovery? You had dropped the ball, and so therefore, you weren't going to be allowed to cross-examine her? The defendant said instead of the motion was allowed by the court at the defendant's request instead of a motion to compel that was filed by the plaintiff. I don't see where I have to file a motion to compel. I had my record, and I planned on bringing out at trial the fact that she had destroyed half of what she reviewed. And under Baldini, the Baldini case and the Carney case, which are both fourth district decisions, the admissibility of evidence, which is substantive evidence, which has been destroyed, that's also admissible. I wasn't allowed to do that, so I said, well, at least keep her to the facts then. Because you can't be an expert and not allow cross-examination of every other 213F free witness. And the court said no, I'm going to let her offer this testimony. And, you know, I put in my brief there, this is a trial court that made some unusual rulings. We had an article, a medical article that was a chart that was blown up and shown to the jury from a medical article. Medical articles aren't admissible in evidence. Their hearsay, that was allowed in. We had some testimony about whether or not her parents' divorce was the cause of her bedwetting that should not have been let in. Medical articles that the defendant procured from an out-of-state provider, the trial court didn't admit medical articles of my client into evidence, based on a foundation objection by the defendants, when defense counsel procured the medical articles via subpoena and produced them to the plaintiff. So we had some unusual rulings in this case, and they deprived my client of a fair trial. I mean, last night a 10-year-old girl wore a diaper to bed. She's entitled to a fair trial. She didn't get one in this case. She's entitled to a trial where, you know, the court's orders are obeyed. She's entitled to a trial where a defendant doctor who is going to be an opinion witness gets treated like every other 213F3 witness, where medical records are admitted, and where a blow-up from some article five years after some guidelines are produced doesn't get passed to the jury and admitted, an opening statement shown to them, and then taken back in deliberations. Medical articles aren't admissible. She was entitled to that, and she didn't get it. And I'm asking the court to give her a new trial so that she has a chance to have her named court. Thank you. Thank you both for your arguments this afternoon. The court will take this case under advisement and rule with dispatch post-haste.